**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Paula J. Harris,              )
                              )
          Plaintiff,          )  Case No. 1:08-CV-325
                              )
     vs.                      )
                              )
Commissioner of Social        )
Security,                     )
                              )
          Defendant.          )

                    O R D E R

          This matter is before the Court on Magistrate Judge

Hogan's Report and Recommendation of September 15, 2009 (Doc. No.

20) and Plaintiff Paula Harris's objections to the Report and

Recommendation (Doc. No. 11).  In his Report and Recommendation,

Judge Hogan found that the Administrative Law Judge's ("ALJ")

determination that Plaintiff is not disabled, and therefore, not

entitled to receive disability insurance and supplemental

security income benefits, was supported by substantial evidence.

Therefore, Judge Hogan recommended that the ALJ's determination

be affirmed and that this case be closed.  For the reasons that

follow, Plaintiff's objections to the Report and Recommendation

are not well-taken and are **OVERRULED**.  The Court **ADOPTS** the

Report and Recommendation.  The Court concludes that the

Administrative Law Judge's determination that Plaintiff is not

disabled was supported by substantial evidence.  Accordingly, the

ALJ's determination that Plaintiff is not disabled is **AFFIRMED.**

## I. Background

Plaintiff Paula J. Harris filed a claim for disability insurance benefits ("DIB") on July 18, 2005 and a claim for supplemental security income ("SSI") on August 29, 2005. Plaintiff alleged an onset date of disabiility of March 2, 2004 due to a right shoulder injury and thoracic outlet syndrome. Plaintiff was 29 years old at the time she filed her claims. Her past relevant work was as a sales representative.

Plaintiff injured her right arm and shoulder on March 2, 2004 when she was placing boxes of laboratory equipment in the trunk of her car. Her arm hyper-extended and she felt a burning sensation running through her arm. Plaintiff was treated initially for this injury at the University of Kentucky Medical Center. On examination, Plaintiff had no edema and minimal tenderness over the anterior aspect of her shoulder. She had full range of motion with no pain over the AC joint. An x-ray showed no evidence of fracture. Plaintiff was discharged with a sling and given a prescription for Celebrex. Tr. 261.[1]

---

[1] It should be noted that the record is in conflict concerning the source of Plaintiff's injury. While Plaintiff claims she sustained her injury while working on March 2, 2004, the treatment notes from the University of Kentucky reflect that Plaintiff had been experiencing shoulder pain for about two months prior to this visit and that the injury occurred when she raised her arm to wash her hair. Tr. 259, 260. The ALJ also observed this discrepancy in his opinion, Tr. 18, but apparently did not take it into consideration in evaluating Plaintiff's credibility. The Court, therefore, simply mentions this anomaly in order to provide an accurate summary of the record.

Plaintiff had follow-up examinations with Dr. Chad
Mathis on March 4, 2004 and March 17, 2004.  On March 4, she
reported continued burning pain in the anterior aspect of her
shoulder and difficulty with activities.  Plaintiff had full
range of motion of her shoulder, but a Hawkin's test was positive
for shoulder impingement.  Dr. Mathis observed impingement
secondary to ligamentous laxity and mild atrophy of the deltoid.
Dr. Mathis wanted to order an MRI to determine whether there was
a mass, ganglion, or impingement on a nerve.  On March 17,
Plaintiff returned still complaining of pain, burning, and
numbness in her shoulder and hand.  Dr. Mathis recorded that
Plaintiff's EMG's were normal and that the MRI showed mild
impingement secondary to underlying instability.  Dr. Mathis also
felt that her complaints sounded like vascular-outflow problems
in her left hand.  Tr. 215.  In a separate office note also
completed on March 17, 2004, Dr. Mathis recorded that Plaintiff's
Allen's test to assess blood supply to the hand was positive.
Dr. Mathis wrote that he was going to refer Plaintiff for an
evaluation for thoracic outlet syndrome.[2]  Tr. 209.

---

[2]    The Court in <u>Watts v. Commissioner of Social Sec.</u>,
179 Fed. Appx. 290 (6th Cir. 2006), defined and explained
thoracic outlet syndrome:

> Thoracic outlet syndrome is a combination of pain,
> numbness, tingling, weakness, or coldness in the upper
> extremity caused by pressure on the nerves and/or blood
> vessels in the thoracic outlet.  The thoracic outlet is
> a space between the rib cage (thorax), and the collar

Plaintiff was eventually referred to Dr. Erdogan Atasoy for treatment for thoracic outlet syndrome. Dr. Atasoy initially examined Plaintiff on May 7, 2004. He noted that Plaintiff's hand was slightly cooler but there was no swelling or atrophy. She had a positive Tinel's sign, i.e., a sensation of tingling upon percussion, at the right carpal tunnel, pronater teres (forearm muscle) and cubital tunnel. There was no epicondylar tenderness. Dr. Atasoy noted that the right scalene and right subcoracoid were quite tender with some pops and cracks. Tapping and compression resulted in a lot of pain to the right upper arm. Plaintiff had right trapezial myofascitis and right upper pectoral myofascitis. Her grip strength was 2 pounds in the right hand and 30 pounds in the left hand. Neck tilt resulted in

---

bone (clavicle) through which the main blood vessels and nerves pass from the neck and thorax into the arm. The syndrome is a set of symptoms and physical findings that point to a certain diagnosis. Various symptoms and physical findings may be present in different grades of severity and all the symptoms and physical findings are not always present. There are several causes of the syndrome, but the most common underlying cause is compression of the nerves and arteries of the arm in the thoracic outlet. In some cases the cause of compression is evident, such as an extra first rib or other congenital abnormality, whiplash from a car accident or an old fracture of the clavicle, all of which may reduce the space of the outlet. In other cases the cause is not clear. Compression may occur with repetitive activities that require the arms to be held overhead.

Id. at 292 n.1 (citing Website of the Office of Communications and Public Information, National Institutes of Health, Bethesda, Maryland).

numbness and tingling in the fourth and fifth digits. Dr. Atasoy
found that Plaintiff was quite symptomatic with right arm and
right hand numbness, pain, and coldness. A C-spine x-ray was
normal. Dr. Atasoy's impression was fairly acute thoracic outlet
syndrome with some right trapezial myofascitis and very
symptomatic right upper pectoral myofascitis. He prescribed
Soma, Baclofen, and Licoderm patches and planned to schedule a
scalene injection. Dr. Atasoy also injected Plaintiff's right
upper pectoral trigger points with "remarkable improvement." Tr.
272.

Plaintiff had the right scalene injection on May 13,
2004. On June 1, 2004, Plaintiff reported that the pectoral
injection lasted one day and the scalene injection lasted two
days. Plaintiff's physical examination results were essentially
the same as her first visit. Dr. Atasoy noted that he was
considering thoracic outlet syndrome surgery. Tr. 272-73. On
June 15, 2004, Plaintiff indicated to Dr. Atasoy that the
injections helped but made her a little sick. Dr. Atasoy
determined to go ahead with surgery. Tr. 273.

Plaintiff had thoracic outlet surgery on July 19, 2004.
This surgery involves removal of the first rib through an
incision in the armpit and removal of the anterior scalene muscle
and part of the middle scalene muscle through an incision in the
neck with the goal of decompressing the brachial plexus and the

subclavian artery and vein.  Tr. 274.   On August 3, 2004, Dr.
Atasoy recorded that Plaintiff was doing well, but with some
morning stiffness in her hands.  On August 31, 2004, Dr. Atasoy
reported that Plaintiff had "much improved" right hand, arm, and
shoulder symptoms.  On September 28, 2004, however, Plaintiff
complained of right shoulder popping and pain, particularly in
the morning.  Dr. Atasoy thought these symptoms suggested right
shoulder instability. Plaintiff also complained of right hand
pain and tightness.  Dr. Atasoy suggested that Plaintiff see a
sports medicine specialist about her shoulder.  Tr. 273.

          Dr. Samer Hasan examined Plaintiff on October 21, 2004.
He found that Plaintiff's active range of motion was well-
preserved.  There was some glenohumeral (shoulder joint)
crepitus.  Plaintiff had some pain with cross body abduction
along the medial border of the scapula and some slight scapular
dyskinesis (abnormal movement).  There was no obvious winging of
the scapula.  There was a positive Hawkin's test and mildly
positive abduction tests for impingement.  She had well-preserved
deltoid strength, supraspinatus (shoulder joint muscle) strength
of 5-/5, external rotation strength of 4+/5 and internal rotation
strength of 4+/5.  For stability, Plaintiff had a negative sulcus
test bilaterally and a negative Rowe test.  Dr. Hasan reviewed x-
rays which showed no glenohumeral arthrosis and no upward

migration of the humeral head relative to the acromion.  There
was some slight AC joint arthropathy.  Tr. 280-81.

Dr. Hasan's impression was that Plaintiff had posterior
capsular tightness and poor scapular mechanics leading to a
diagnosis of secondary impingement.  Dr. Hasan recommended a
"very conservative" treatment plan with an emphasis on anti-
inflammatories, activity modification, and physical therapy.  Dr.
Hasan stated that "I have made it very clear to her today that
she does not have multidirectional instability based on negative
sculus tests.  There is no exacerbation with the external
rotation at side and in fact, she has a tight posterior capsule
as well."  Tr. 280.

Plaintiff returned to Dr. Hasan for a follow-up
examination on November 18, 2004.  Dr. Hasan observed that
Plaintiff appeared to be responding slowly to physical therapy.
Plaintiff reported improved strength and a dissipation of the
burning sensation in her arm.  She did, however, complain of
increasing pain of a similar pattern in her left arm.  On
physical examination, Plaintiff's range of motion of her right
shoulder was excellent.  There was some slight discomfort in
terminal external rotation but internal rotation had improved.
There was, however, diminished internal rotation abduction.
There was pain over the posterior capsule during cross body
abduction but improved rotator cuff strength.  Plaintiff's motor

strength for all groups was 4/5. There was no point tenderness over the distal supraspinatus but some continuing discomfort over the medial border of the scapula bilaterally. Dr. Hasan's impression was that Plaintiff had some posterior capsular contraction, and poor scapular muscle coordination and strength which was likely exacerbated by her recent scalenectomy. Dr. Hasan recommended further physical therapy and switched Plaintiff to Voltaren. Tr. 277.

Plaintiff returned to Dr. Atasoy on November 30, 2004. Dr. Atasoy recorded that she was "doing well" although physical therapy was causing her some pain. He thought she might be able to return to work "early next year." On February 18, 2005, Dr. Atasoy wrote that the "TOC surgery helped at lot." Plaintiff, however, still had many complaints about her right shoulder. Plaintiff had painful trigger points on her right side which he injected with improved upper back and right hand and arm symptoms. Tr. 267. On the same date, Dr. Atasoy completed a capabilities and limitations worksheet for Aetna which indicated that Plaintiff had substantial postural and weight lifting limitations although she was capable of occasional grasping and manipulation with her hands. He stated that Plaintiff was unable to work due to her surgery. Tr. 284.

Plaintiff went to the Cleveland Clinic for evaluation in March 2005 but was not actually examined until May 17, 2005 by

Dr. Richard Lederman.  Plaintiff complained of pain in her spine, shoulders, and right arm and hand that was 8 on a scale of 10. She characterized the pain as burning, numbness, tight band, and hot flash.  On examination, Dr. Lederman found normal muscle tone and bulk and no weakness in any muscle group in the upper limbs. She did have give away weakness on the right side.  There was some sensory loss in the right clavicular area and some reduced perception of pinprick on the right small and ringer finger compared to the more radial digits.  Plaintiff's deep tendon reflexes were brisk and symmetrical, including finger flexor, biceps, brachioradialis, and triceps reflexes.  Dr. Lederman felt that Plaintiff's thoracic outlet surgery had not resolved her problems and that, therefore, her symptoms suggested complex regional pain syndrome.  Dr. Lederman planned to get an EMG of her right arm to ensure there was no nerve injury and also noted that the surgery may have caused some focal injury.  He suggested referral to pain management.  Tr. 317.

Plaintiff was evaluated by the Cleveland Clinic Pain Management Center and underwent a stellate ganglion block procedure on June 22, 2005 and a lumbar sympathetic nerve block procedure on July 11, 2005.  Tr. 307-09.  On August 8, 2005, Plaintiff reported to Dr. Atasoy that the nerve block procedures helped with her pain.  She still complained of right upper back

and pectoral trigger points which Dr. Atasoy injected with "good relief." Tr. 267.

Plaintiff began treating with Dr. Todd Cook in September 2005. On an October 4, 2005 office note he recorded that Plaintiff had better range of motion, somewhat less pain, and some symptomatic improvement. He ordered a three phase bone scan which showed some degenerative changes in the lower spine, but no reflex sympathetic dystrophy ("RSD"). Tr. 386. A venous Doppler study showed no deep or superficial bone thrombosis in the upper right extremity. Tr. 387. X-rays of the right hand showed no osteoporosis or demineralization in the hand. Tr. 388. On April 28, 2006, Dr. Cook reported to Aetna that Plaintiff was severely limited due to thoracic outlet syndrome and myofascitis. He noted that she had persistent pain in the upper back, shoulders, and neck. He felt her prognosis was poor and that she had not reached maximum medical improvement. Despite the fact that it showed no evidence of RSD, Dr. Cook cited the bone scan as a diagnostic study supporting his opinion. Tr. 359-60.

Plaintiff began physical therapy treatments with Daniel Lilley on January 12, 2006. Mr. Lilley's notes reflect increasing improvement in Plaintiff's pain. On January 15, 2006, Mr. Lilley reported that her pain had "almost completely disappeared." Tr. 406. In February 2007, Mr. Lilley reported that since treating with him, Plaintiff had a 65% reduction in

pain, her right hand went from cold to almost warm, the pain in right hand was almost gone, she could now use her right hand to feed herself, drive, write, and shake hands, and that she had reduced her use of Neurontin for pain control by 50%. Tr. 402-03. On September 13, 2007, Plaintiff told Mr. Lilley that she stopped having neuropathic pain in back and shoulder when she discontinued Benadryl. Her grip strength on the right hand was 68 psi compared to 20 psi a year earlier. Tr. 400.

Drs. R.K. Brown and John Rawlings, state agency physicians, provided physical residual functional capacity assessments of Plaintiff on May 3, 2005 and September 19, 2005. Dr. Brown found that Plaintiff can lift 10 pounds frequently and 20 pounds occasionally. She can sit, stand, or walk for six hours in an eight hour day but was limited in pushing and pulling with the upper extremities. The other important limitations noted in his RFC were that Plaintiff was limited in reaching and handling, but not fingering or feeling. In his accompanying note to explain the "limited" activities, Dr. Brown stated that Plaintiff can occasionally reach and handle with the right hand and frequently reach and handle with the left hand. Tr. 326. Dr. Rawlings confirmed Dr. Brown's RFC. Tr. 337.

Plaintiff's application was denied initially and upon reconsideration. She requested and received a hearing before an ALJ which took place on October 24, 2007. Plaintiff, medical

expert Dr. Arthur Lorber, and vocational expert Robert Breslin testified during the hearing.

Plaintiff is right-handed.  She testified that the thoracic outlet surgery helped for the first couple of months but that she experienced another shoulder impingement during physical therapy.  Plaintiff said that now, however, her right arm is no better than it was before the surgery.  Plaintiff testified that she still has pain that runs from her right shoulder through her right arm and into her neck.  Her cervical and thoracic spine are "fairly painful" and she still gets numbness and burning sensations in her arm.  She said that she has difficulty grasping and manipulating things because her fingers go numb.  Plaintiff testified that she can only lift about five pounds with her left arm and less with her right arm.  Plaintiff stated that she can only write for about fifteen minutes at a time and only for thirty minutes a day total.  Plaintiff can pick up a coffee cup, button buttons, zip zippers, and sometimes open jars with her right hand.  She cannot open heavy doors with her right hand.  Plaintiff can do some reaching.  She can drive for one hour without pain.  Plaintiff grocery shops with assistance and does minimal cooking and laundry.  She does not do the dishes, take out the garbage, or do any house cleaning or yard work.  Plaintiff has trouble using a computer keyboard and can only type for about thirty minutes and then has to stop for several hours.

Because of pain in her neck, she can only hold her head in a posture for working at a desk or computer for about an hour at a time.  Plaintiff can eat, brush her hair, and brush her teeth with her right hand.  Tr. 433-53.

After summarizing the records, the medical expert, Dr. Lorber, opined that Plaintiff did not have a severe impairment and had "no limitations whatsoever either in manipulative abilities, exertional abilities, or environmental abilities." Tr. 459.  Dr. Lorber did not specifically state the basis for this opinion, but his summary consistently noted the results of objective tests.  For instance, Dr. Lorber noted that Plaintiff had full range of motion, an EMG revealed no evidence of brachial flexopathy, the bone scan showed no evidence of RSD, and her right side grip strength was greater than her left.  Tr. 457-58. Therefore, it is fair to conclude that Dr. Lorber's opinion was based on the objective tests in the record.

In a question to the vocational expert, the ALJ posited a hypothetical person with the following RFC: she is right hand dominate; she can lift, carry, push and pull up to ten pounds occasionally and five pounds frequently; she has no walking, standing, or sitting limitations; she can perform occasional stooping, kneeling, crouching, and climbing of ramps and stairs; she cannot crawl, climb ladders, ropes or scaffolds; she can reach above the shoulder occasionally with her right arm; she

cannot work at unprotected heights or with vibratory tools. The
vocational expert testified that such a hypothetical person would
be able to perform Plaintiff's past relevant work as a sales
representative. Tr. 467-69. The vocational expert further
testified that the hypothetical person would be able to perform
the sales representative position even with added limitation that
she can only perform handling and fingering no more than
frequently. Tr. 469. However, if this hypothetical person could
only perform handling and fingering occasionally, she would not
be able to perform any of her past relevant work. Tr. 470.

On December 13, 2007, the ALJ issued a decision finding
that Plaintiff is not disabled, and thus not entitled to receive
DIB and SSI, at the fourth step of the sequential evaluation
process because she has the RFC to perform her past relevant work
as a sales representative. In reaching this conclusion, the ALJ
adopted the RFC of the hypothetical person he posited to the
vocational expert during the evidentiary hearing.

In arriving at this RFC, the ALJ rejected Dr. Atasoy's
opinion that Plaintiff is not able to return to work because it
was based on Plaintiff's subjective reports and because it was
consistently contradicted by diagnostic testing and other
physicians' findings. He also noted that subjective symptoms
alone are inadequate proof of disability and that the question
whether the claimant is disabled is reserved for the

Commissioner.  The ALJ also noted that while Dr. Cook cited the
bone scan as evidence of Plaintiff's disability from thoracic
outlet syndrome, the scan itself showed no problems.  Tr. 21.

The ALJ found that Dr. Lorber accurately summarized the
evidence but rejected his opinion to the extent that he concluded
that Plaintiff does not have a severe impairment.  The ALJ
concluded that Plaintiff does experience pain, but that the
severity of her allegations of pain and the consequent
limitations imposed by her pain were questionable given that the
objective diagnostic tests failed to reveal any significant
abnormalities.  The ALJ gave little weight to the opinions of
physicians who found that Plaintiff is disabled for the same
reason.  On the other hand, the ALJ gave little weight to the
opinions of the state agency physicians because they did not
adequately consider Plaintiff's subjective complaints of pain.
Tr. 21.

Thus, in determining Plaintiff's RFC, the ALJ stated
that he relied "heavily" on Plaintiff's testimony to the extent
it was credible and consistent with objective findings.  He found
that Plaintiff would have some difficulty lifting and carrying
but that the objective findings indicated that she should be able
to lift 10 pounds occasionally and 5 pounds frequently.  The ALJ
felt that this limitation took into account Plaintiff's claims of
diminished strength even though they were contradicted at other

places in the record.  He found that she can only occasionally reach above the shoulder due to shoulder pain and that she can only occasionally stoop, kneel and crouch due to neck, arm, and spine pain.  The ALJ determined that Plaintiff can never use vibratory tools or crawl, climb, or use ladders, ropes, and scaffolds because of her arm and shoulder pain.  However, because Plaintiff testified that she can button, open jars, zip, comb her hair, brush her teeth, and eat with her right hand, the ALJ concluded that she has "very few" limitations in her ability to finger and handle.  Instead, the ALJ noted, Plaintiff reported the most discomfort with lifting heavy objects.  Therefore, he concluded that Plaintiff can frequently perform fingering and handling.  Tr. 22.

Relying on the vocational expert's testimony, the ALJ found that this RFC allowed Plaintiff to perform her past relevant work both as customarily performed and as she actually performed it.  Therefore, the ALJ found that Plaintiff is not disabled pursuant to the Social Security Act and thus not entitled to receive DIB and SSI benefits.  Tr. 22.

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Plaintiff then filed a timely complaint with this Court for review of the ALJ's decision denying her claim for benefits.

Plaintiff asserted four assignments of error in her complaint. First, she contends that the ALJ failed to explain the weight he gave to the opinions of the various physicians of record and, relatedly, that he erred in not giving the most weight to her treating physicians. Second, Plaintiff contends that the ALJ erred in evaluating her subjective complaints of pain. Third, Plaintiff contends in the alternative that the ALJ erred in not finding that she is entitled to benefits for a closed period of disability. Fourth, Plaintiff contends that the ALJ's hypothetical to the vocational expert was improper because he failed to include the limitation that she is only capable of performing occasional fingering and handling.

Magistrate Judge Hogan's Report and Recommendation found no error with the ALJ's decision. He agreed that the opinions of the treating physicians were not entitled to controlling weight because they were not supported by diagnostic tests and the opinions of other physicians. Judge Hogan also determined the ALJ properly evaluated Plaintiff's subjective complaints of pain and that his credibility determinations were entitled to deference. Judge Hogan then concluded that the record supported the ALJ's decision that Plaintiff is not entitled to a closed period of disability. Finally, Judge Hogan found that the ALJ's hypothetical to the vocational expert was proper because substantial evidence supported his determination

that Plaintiff is capable of performing frequent handling and
fingering.  Therefore, Judge Hogan recommended that the ALJ's
decision be affirmed and the case be closed on the docket of the
Court.

Plaintiff then filed timely objections to Judge Hogan's
Report and Recommendation which are now ripe for consideration.

## I. Standard of Review

The relevant statute provides the standard of review to
be applied by this Court in reviewing decisions by the ALJ.  See
42 U.S.C. § 405(g).  The Court is to determine only whether the
record as a whole contains substantial evidence to support the
ALJ's decision.  "Substantial evidence means more than a mere
scintilla of evidence, such evidence as a reasonable mind might
accept as adequate to support a conclusion."  LeMaster v.
Secretary of Health & Human Serv., 802 F.2d 839, 840 (6th Cir.
1986) (internal citation omitted).  The evidence must do more
than create a suspicion of the existence of the fact to be
established.  Id.  Rather, the evidence must be enough to
withstand, if it were a trial to a jury, a motion for a directed
verdict when the conclusion sought to be drawn from it is one of
fact for the jury.  Id.  If the ALJ's decision is supported by
substantial evidence, the Court must affirm that decision even if
it would have arrived at a different conclusion based on the same
evidence.  Elkins v. Secretary of Health & Human Serv., 658 F.2d

437, 439 (6th Cir. 1981).  The district court reviews <u>de novo</u> a magistrate judge's report and recommendation regarding social security benefits claims.  <u>Ivy v. Secretary of Health & Human Serv.</u>, 976 F.2d 288, 289-90 (6th Cir. 1992).

### III. <u>Analysis</u>

#### A. <u>The Opinions of Treating Physicians</u>

Plaintiff first contends that the ALJ and Magistrate Judge Hogan erred in their assessment of the opinions of her treating physicians.

Under the treating physician rule, opinions of physicians who have treated the claimant receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  If the ALJ finds that either of these criteria have not been satisfied, he is required to apply the following factors in determining how much weight to give a treating physician's opinion: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."  <u>Wilson v. Commissioner of Social Sec.</u>, 378 F.3d 541, 544 (6th Cir. 2004).  The ALJ must give "good reasons" for rejecting the opinion of a

19

treating physician.  The ALJ's failure to comply with the "good
reasons" rule is a procedural error which generally requires
reversal even if the record otherwise supports the ALJ's
determination.  Rogers v. Commissioner of Social Sec., 486 F.3d
234, 242-43 (6th Cir. 2007); see also Rabbers v. Commissioner
Social Sec. Admin., ___F.3d.___, No. 07-00845, 2009 WL 3162262,
at *8 (6th Cir. Oct. 5, 2009) (noting that the Wilson opinion
left open the possibility that a de minimis violation of the
"good reasons" rule can be a harmless error).

        In her objections, Plaintiff reiterates her contention
that the ALJ failed to give good reasons for rejecting the
opinions of her treating physicians and that he failed to explain
the weight he gave to the opinions of the physicians of record.

        The Court initially observes that the ALJ both stated
and explained the weight he gave to the opinions of the various
physicians.  First, the ALJ explained that he gave "little
weight" to the opinions of physicians who determined that
Plaintiff is disabled.  Tr. 21.  This finding impliedly covers
the opinions of Drs. Atasoy and Cook.  Second, the ALJ
specifically stated the reason for the weight he assigned to
their opinions - they were not supported by objective tests of
record.  This conclusion, as will be explained momentarily, was
supported by substantial evidence.  Third, the ALJ specifically
stated that he gave "little weight" to the opinions of the agency

20

physicians.  He also explained why – they did not take into

consideration her subjective complaints of pain.  Tr. 21.  The

ALJ did not specifically state the weight he gave to Dr. Lorber's

opinion, but he clearly rejected that opinion to the extent Dr.

Lorber concluded that Plaintiff does not have a severe medical

impairment.  Tr. 21.  Therefore, the ALJ did not fail to state

the weight given to the opinions of the physicians of record.

     Moreover, the ALJ correctly applied the treating

physician rule in assigning little weight to Dr. Atasoy's and Dr.

Cook's opinions.  As the ALJ accurately stated, their opinions

were not supported by objective diagnostic testing and the

opinions of other physicians.  Dr. Cook's opinion was

contradicted by the very bone scan he cited as evidence of

Plaintiff's disability.  As the ALJ explained, and the Court's

recitation of the medical evidence confirms, although Plaintiff

underwent surgery for thoracic outlet syndrome, "the EMG, X-rays,

and MRI's showed no significant abnormalities."  Tr. 21.  The

bone scan showed no evidence of RSD.  Plaintiff's strength tests

were generally good.  Indeed, Plaintiff's right hand grip

strength improved to the point it was greater than her left hand.

Dr. Hasan definitively stated that Plaintiff does not have

shoulder instability.  These factors provided a sufficient basis

for the ALJ to reject the opinions of Dr. Atasoy and Dr. Cook.

See Rabbers, 2009 WL 3162262, at *13 (holding that the ALJ

properly rejected the opinions of claimant's treating physician where it was not supported by medical records and treatment notes and gave "several valid reasons" why it was contrary to other evidence in the record).

Accordingly, this objection is not well-taken and is **OVERRULED.**

### B. Subjective Complaints of Pain

Plaintiff next contends that the ALJ erred in assessing her subjective complaints of pain. The ALJ relied on Plaintiff's testimony to the extent he found it credible to find that she can perform sedentary work with some limitations. See 20 C.F.R. § 404.1567 ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.").

According to the Social Security regulations, a claimant's "pain or other symptoms will not alone establish that [she is] disabled[.]" 20 C.F.R. § 404.1529(a). The Sixth Circuit has developed a two-part test for evaluating claims of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th

Cir. 1997).  This test, however, does not require objective evidence of the pain itself.  Felisky v. Bowen, 35 F.3d 1027, 1039 (6th Cir. 1994).  The ALJ may consider the claimant's credibility in assessing complaints of pain and his credibility determinations are entitled to great weight and deference if they are supported by substantial evidence.  Walters, 127 F.3d at 531.

As indicated above, the ALJ credited Plaintiff's testimony to the extent it was consistent with the objective findings.  Although Plaintiff cites evidence that supports her subjective complaints of pain, as just discussed, nearly all of the objective diagnostic evidence in the record supports the ALJ's conclusion that the severity of her complaints are overstated.  Tr. 21.

Plaintiff's principal objection seems to be that the ALJ did not credit all of her testimony in developing her RFC.  She notes that she testified that she rests during the day and can only write and read for 15 minutes at a time.  Plaintiff argues that this evidence indicates that she is incapable of working 40 hours per week.  Elsewhere in his opinion, however, the ALJ cited evidence which contradicts these arguments.  The ALJ noted that Mr. Lilley's reports note that Plaintiff can feed herself, drive, shake hands, and write with her right hand.  Additionally, Plaintiff's right hand grip strength was greater

than her left hand.  Also, her pain improved to the point where
she cancelled exploratory surgery.  While Plaintiff
complains that the ALJ did not consider the medication she was
taking, the ALJ noted that she had decreased her Neurontin use by
50% and stopped using pain control medication altogether when she
became pregnant and was able to tolerate the pain.  Therefore,
the ALJ did consider her use of pain medication in developing her
RFC.

Plaintiff also contends that the ALJ did not consider
her good work record in judging her credibility.  Magistrate
Judge Hogan apparently did not believe that Plaintiff's work
record substantially bolstered her credibility.  Doc. No. 10, at
16 (noting that Plaintiff was at her jobs for 6 months, 1 year,
and "two or three" years and that she filed for disability prior
to age 30).  There is no question that a good work record
enhances a claimant's credibility.  Felisky v. Bowen, 35 F.3d
1027, 1041 (6th Cir. 1994) (noting that claimant's 17 year work
history supported her credibility).  In this case, the record
reflects that Plaintiff worked full-time for about seven years
before claiming disability.  Tr. 77.  Whether this is a good work
record, a bad work record, or simply an average work record
probably cannot be decided as a matter of law.  It is fair to
say, however, that Plaintiff's work record pales in comparison to
the claimant's "good" work record in Felisky.  It is further fair

to say that Plaintiff's work record is not so substantial that it outweighs the principal basis for the ALJ's decision - her complaints of pain are not supported by the objective medical evidence in the record. Therefore, to the extent he was required to do so, the ALJ's failure to consider Plaintiff's work record in assessing her credibility was harmless error.

In summary, for the reasons stated, the ALJ did not err is assessing Plaintiff's credibility. Accordingly, this objection is not well-taken and is **OVERRULED.**

## C. Vocational Error

Plaintiff contends that the ALJ made a vocational error in his hypothetical to the vocational expert by not including the limitation that she is only capable of occasional fingering and handling. Plaintiff notes that if she can only do occasional fingering and handling, she cannot do any work according to the vocational expert and, therefore, is disabled.

While the ALJ is required to include all of the claimant's limitations in his hypothetical to the vocational expert, he is not required to include limitations from opinions he has rejected. Pratt v. Commissioner of Social Sec., 72 Fed. Appx. 417, 419 (6th Cir. 2003). Therefore, in this case, the question is whether there was substantial evidence to support the ALJ's conclusion that Plaintiff is capable of frequent fingering and handling. The Court finds that substantial evidence supports

this conclusion.  Although the state agency physicians determined that Plaintiff can only do occasional fingering and handling,[3] the ALJ gave little weight to those opinions.  Instead, the ALJ based this aspect of Plaintiff's RFC on her ability to do such things as eat, open jars, brush her teeth, and button and zip with her right hand.  These findings were bolstered by Mr. Lilley's report on Plaintiff's substantial increase in function with her right hand.  Plaintiff's ability to perform these tasks shows that she does not have any significant restriction in function with her right hand.  Maple v. Apfel, 14 Fed. Appx. 525, 536 (6th Cir. 2001).  Therefore, the ALJ's hypothetical to the vocational expert was supported by substantial evidence.

Accordingly, this objection is not well-taken and is **OVERRULED.**

## D. Closed Period of Disability

Finally, and in the alternative, Plaintiff argues that the ALJ erred in not finding that she is entitled to a closed period of disability.  A social security claimant may be awarded benefits for a closed period from the onset of disability through the date it ceases.  Wells v. Commissioner of Social Sec., No. 1:08-cv-148, 2009 WL 648603, at *6 (S.D. Ohio Mar. 10, 2009)

---

[3]     More accurately stated, the state agency physicians found that Plaintiff can do frequent fingering and handling with her left hand and occasional fingering and handling with her right hand.

(Beckwith, S.J.).  The claimant, however, must be continuously disabled for twelve months to qualify for a closed period of disability.  Id. In this case, the ALJ found that the record does not support a finding of twelve continuous months of disabiility.  Tr. 21.  Substantial evidence supports this conclusion.  As the ALJ stated in his opinion, none of the objective medical evidence in the record supports the treating physicians' disabling opinions or Plaintiff's subjective complaints of pain.  Therefore, the ALJ did not err in finding that Plaintiff is not entitled to a closed period of disability benefits.

Accordingly, this objection is not well-taken and is **OVERRULED.**

Conclusion

Magistrate Judge Hogan accurately analyzed the ALJ's decision in his Report and Recommendation.  Therefore, Plaintiff's objections to the Report and Recommendation are not well-taken and are **OVERRULED.**  The Court **ADOPTS** the Report and Recommendation.  The ALJ's decision that Plaintiff is not disabled is supported by substantial evidence and it is, therefore, **AFFIRMED.  THIS CASE IS CLOSED.**

**IT IS SO ORDERED**

Date_November 3, 2009_              _____s/Sandra S. Beckwith_____
                                         Sandra S. Beckwith
                                 Senior United States District Judge